## BUSH v. THE PEOPLE.

1. While the owner of property may not commit a homicide for the purpose of protecting it against a trespasser, he is not bound to a passive submission which neither remonstrates nor resists.

2. On indictment for homicide it appeared that defendant's brother was the owner of a parcel of ground upon which deceased had, without his knowledge or consent, erected a shanty, and of which he was holding possession. The owner, with others, entered upon the land for the purpose either of forcibly ejecting any person that might be in possession or removing the shanty without such person's consent, and in the controversy which followed deceased was killed by defendant. The jury were instructed, in substance, that if they should find that the defendant, in company with his brother, or soon after, entered upon the land in furtherance of the common design, and was aiding and advising him therein, and that he was aware at the time that the difficulty had arisen from such entry and design, then the killing would not be justifiable and the defendant should be found guilty. *Held* error.

*Error to District Court of Chaffee County.*

Messrs. WELLS, MACON and McNEAL, for plaintiff in error.

ALVIN MARSH, Attorney-General, for defendants in error.

ELBERT, J. The plaintiff in error, James Bush, was indicted for the murder of Mortimer Arbuckle. Upon the first trial the jury disagreed; upon the second the accused was found guilty of voluntary manslaughter and sentenced to eight years' imprisonment in the penitentiary. The case is brought to this court by writ of error.

The homicide occurred on the 10th of March, 1879, about 8 o'clock in the morning, at Leadville, in the county of Lake. It appears from the evidence that a portion of the town site of Leadville had been theretofore entered as a placer claim by Stevens & Leiter, and that a patent had been issued to them therefor. This parcel of ground had been subdivided by the Leadville Improvement Com-

pany, grantee of Stevens & Leiter, into lots and blocks, and many of the lots had been sold and conveyed by that company to purchasers. William Bush, the brother of the accused, appears to have purchased from this company five of these lots for the sum of $875 each. He had made a partial payment, and, under his agreement with the company, had possession and was to have a deed for the lots upon the payment of the balance of the purchase money. These lots were situated upon Harrison avenue, nearly opposite the Clarendon Hotel. They appear to have been occupied by a number of different tenants, all of whom, according to the testimony of William Bush, had entered into a written agreement to pay him rent and to vacate the premises upon demand. It appears that one of these lots (lot 9 of the old survey and lot 7 of the new survey) had been sold by William Bush to one Shute for the sum of $3,000, payable in sixty days; that Bush had caused a deed of said lot to be made by the Leadville Improvement Company direct to Shute, and had placed the same in escrow in the Bank of Leadville to be delivered to Shute upon compliance with the conditions of the escrow. Bush testifies that he caused the deed thus to be made direct to Shute instead of himself in order to save the expense of making and recording two deeds, and also that he was to hold possession until he was paid. There appears to have been a cabin situated, in whole or in part, upon the back part of this lot, occupied by a tin shop, also a shed or lean-to, as it is called by the witnesses, which was hired and used by one Boettcher as a place of storage. It was upon this lot, so sold by William Bush to Shute, that the homicide took place.

Prior to the date of the homicide, questions appear to have arisen touching the validity of the Stevens & Leiter title, and many persons, believing, or being advised, that the Stevens & Leiter entry would or might be canceled, and that actual occupants of lots in that event would be-

come entitled thereto, engaged in what is called by the witnesses "lot jumping." This gave rise to more or less excitement in the community, to frequent disputes, and to occasional personal rencounters between those claiming title to the lots from Stevens & Leiter and persons seeking to occupy. Out of this condition of things grew the trouble which resulted in the killing of Mortimer Arbuckle by the defendant, James Bush. It appears that on the morning of the day of the homicide, and between the hours of 3 and 6, the deceased and one Hopewell, acting upon the advice of their attorney, Forhan, who, it appears, was to have an interest with them in the lot, taking with them one Sprague, a carpenter, entered upon the lot and erected thereon a board "cabin," as it is called, about eight feet by ten in size, and also put up on the front of the lot a temporary board fence. This was done by the deceased and Hopewell, with a view to acquiring title to the lot, the arrangement being that their attorney was to occupy the cabin which they had so erected as an office. Having completed their cabin, between 5 and 6 o'clock in the morning, they left for the purpose of getting their breakfast. What occurred thereafter is thus told by the witness Hopewell:

"Then Sprague, Arbuckle and myself came to Harrison avenue, and to where we erected this cabin, went into the cabin, took out some tools, took them down to Heller's cigar store; Sprague went to his work, and Arbuckle and I walked up Harrison avenue north, on the west side of the street, past this cabin; half a block past it, or maybe further, we passed some men coming down on the west side of Harrison avenue, going south. We turned and followed them down; they turned then and crossed the street to where this cabin that we had erected was, and one of them knocked down a little board fence we put up in front of it, and one of them, a Mr. Shute, got a prop, and was going to throw the cabin off. Arbuckle asked him what he was going to do, and he

said he was going to throw the cabin off, or to that effect, and Arbuckle asked him what right he had; he said it was his lot; Arbuckle said if he owned the lot and had got a deed or title that he would take the cabin off himself. Then there was some talk about it; Shute stated that he had deeds for the lot in the bank. I stated, also, that if he had title deeds we would take it off. Then Shute appeared to be satisfied, throwed down the pole, and walked around toward the new building, Boettcher's hardware store, on the southerly side; then William Bush stepped towards Arbuckle, and called him a 'lot-jumping s—n of a b—h,' or a 'damned lot-jumper,' or some words like that; had his hands up as if he was going to fight, and Arbuckle threw up his hands and said something like he could not call him a s—n of a b—h. I was standing a little to the right of Arbuckle, and I said, 'Here, none of this,' and put my hands out to sort of separate them, when James Bush, who was standing a little back of William Bush, and I think a little to the west of him, fired the shot that killed Arbuckle. I saw the pistol; the next instant Arbuckle fell over. I saw James Bush level the pistol at Arbuckle; it was done in almost an instant. I recollect distinctly the pistol leveled in his hand and shot fired; Arbuckle fell over backwards. He and Bill Bush were three or four feet apart; Jim Bush was eight or ten feet back of Bill. We could all see one another, as we were standing close together; Arbuckle was on my left, Bill in front of him, Jim Bush diagonally in front of him, facing him. Jim Bush hadn't said anything at that time, that I heard, nor had anything occurred to call Arbuckle's attention to Jim Bush at the time. Arbuckle, I think, was looking at William Bush; his hands were up in a fighting position; both he and Bush were in a position to fight. William Bush seemed to be looking straight at Arbuckle. There were some other men there; don't remember who they were; think there were five men in the party with Bush

and Shute. Nobody there represented the lot except Arbuckle and myself; don't think I had made any other remark than what I have stated. After Shute had thrown down his pry there was some conversation which I don't remember; I don't think it was over five or ten seconds from the time Bush and Arbuckle started the conversation until the shot was fired. The words were scarcely spoken, the men were right in position as if .they were going to fight, when the shot was fired; think this was about 8 o'clock in the morning. Arbuckle fell with his head toward the corner of the cabin, the southeast corner; he fell over on his back, with his face thrown up; the blood spurted two or three inches high from the wound. There were some pieces of board lying there belonging to the new building which they were putting up; don't remember how the arms and hands of the deceased lay; didn't notice anything particular about them. I was confused, I think. After that I went off down Harrison avenue. When he fell over towards the corner of the cabin, I stooped down and touched his head; there was a sort of gasp; I got up and left, and went down Harrison avenue to see about having Bush arrested and to get a doctor. * * * He (Arbuckle) didn't carry any weapons. He owned a pistol; we left it in the cabin down on Sixth street. I particularly remember this matter, because we had an understanding with Forhan, the lawyer. He had no weapon upon him that I know of; he could not have had. I had last seen Arbuckle's pistol the day before, hanging up in the kitchen. He had a small pocket-knife; the pistol was at the cabin after that; don't remember what became of it. * * * I might have heard Mr. Bush use that word, or something like it; he was addressing Arbuckle, and my own impression was,.and my remembrance of it is, he called him a 'damned lot-jumping s—n of a b—h,' or words to that effect. Then it was that Arbuckle made a motion as if he would strike Bush; don't remember whether

there was any blow struck or not; know that Arbuckle and Bush were both in fighting position; that Arbuckle drew back at the instant, as if he was going to hit Bush or Bush him; whether the blow was struck I don't remember; I don't think it was, though. When Bush raised his hands as though he would strike Arbuckle, Arbuckle did not step back and draw his hand back this way towards his right hip-pocket; no, I think not; my impression is both men were going for one another, stepping forward. I was standing quite close to him at the time those remarks were made; I was not over three feet from him. I didn't see Arbuckle step back and put his hand towards his hip-pocket; I will swear that he didn't do it to the best of my recollection and belief. I don't know how his hands were when he fell; I didn't, as soon as Arbuckle fell, take his hand from under him and draw something out of his hand, or out of his pocket, and put it in my coat pocket; I am positive of that. I didn't have a hammer in my hand at the time of the shooting; didn't stand by the side of Arbuckle with the hammer raised in a striking attitude."

There is no material conflict of testimony except as to what the deceased and Hopewell, just prior to the homicide, said and did.

William Bush testifies: "On the morning of the 10th of March, when I got opposite to the Clarendon Hotel, I noticed that during the night there had been a small shanty built on this lot that I owned, and I walked up the street to about Fifth street, and met Mr. Shute coming down to tell me about somebody having jumped the lot during the night, and we walked on together, and he kicked off a board from a kind of fence that had been built in front of it; the fence had been built on posts which we had on the ground before. He kicked the top board off, and stepped over on the lot. We talked about two or three seconds, and he kicked off another board, and picked up a piece of 2x4 or something of that kind

and started to the back of the shanty, and just at that time a man, whom I afterwards knew as Arbuckle, asked him what he was going to do, and he said: 'I am going to tear this down.' Arbuckle said: 'No s—n of a b—h can tear that building down and live. If you will show me your title to this I will move it off myself.' Shute said: 'Come with me down to the bank, or down to the recorder's office, and I will show you the title;' and he said: 'I won't go.' I said: 'If you will go with me to the bank where I can see my deeds I will show you all the titles, the original papers, and the title from the government.' He said: 'I won't go; you show it to me.' I said: 'Do you think I carry a deed around in my pocket to show to every s—n of a b—h of a lot-jumper in Leadville?' and when I said that he jumped up and struck me. I put up my left hand and caught the blow, and jumped back, and he put his hand on his hip-pocket, and at the same moment Hopewell stepped forward, with a hammer in his hand, like this, and at that moment a shot was fired and he fell. I saw Mr. Sullivan just before this controversy ended, going over, and he stopped at this lot, and came to the corner, and stopped there. I was about four feet from Arbuckle when the shot was fired; about the same distance from Hopewell at the time he stepped forward, and Arbuckle back, about four feet; Shute went in my company to that lot; nobody else directly in company with us; there were others came afterwards. Before the first board had been kicked down, and we had stepped into the lot and turned around, I saw several persons a very short distance from us. From the time Shute was first addressed by Arbuckle until the shooting I don't think over thirty seconds elapsed at the outside; the conversation was very rapid — a great deal quicker than I can tell it. I didn't see James Bush until after the shooting; I didn't know that he was there. When Shute and Arbuckle fell I thought both of them were killed. While I and Arbuckle were sparring, Shute

was standing to my left, and I really don't know what he was doing; I know he fell down. I don't of my own knowledge know where James Bush stood when the shot was fired; I didn't see him on the lot; I saw him right out here on the sidewalk; I cannot tell where the shot came from, except what I found out since that; the shot seemed to come from the left side of me. I was in such a position that I am able now to say that the shot did not come from the northeast corner of the lot; I know it didn't; I was looking directly northeast. The shot took effect in the man's left cheek. [Gives position of parties.] When he put his hands behind him the body moved this way, and at that instant the shot was fired; he fell at once; he fell on his back, on his right side, with his hand under him. My recollection is that Hopewell, Roberts and Joy had hold of the body about the same time; don't think that either of them were three seconds ahead of the other; I saw Hopewell stoop down and take the hand of the dead man out of his pocket, and I saw what appeared to be a knife; I saw the jaws of it about an inch and a half out of his hand; it was a large knife; it looked like brass; I got a kind of glimmer of something bright; Hopewell put it in his pocket and walked off; he didn't stay there two seconds after that." Both the witnesses, Hopewell and William Bush, are corroborated in most respects by a number of witnesses in their respective accounts of what was said and done at the time of the homicide. The testimony is very voluminous, extending over one thousand three hundred folios; there is no occasion for reviewing it *in extenso*. The extracts which we have given sufficiently show the case sought to be made by the prosecution, the case sought to be made by the defense, and the material points on which the testimony conflicted. The assignments of error principally relied upon are to the second and sixth instructions given by the court. We notice them in their order.

Exception is taken to the last paragraph contained in

the second instruction. The instruction is as follows: "If William H. Bush was assaulted by the deceased and another, and the circumstances were such as to induce in the mind of defendant a reasonable and well-grounded belief that his brother was at that time actually in danger of losing his life, or suffering great bodily harm at the hands of deceased, or deceased and another, then defendant was justified in defending his brother, even to the extent of taking his life, whether the danger was real or apparent; and if defendant really acted under the influence of such fears, and not in a spirit of revenge, you will find him not guilty; *but, if you believe beyond a reasonable doubt from the evidence that defendant, by his presence or otherwise, was aiding or advising his brother in the commission of the act which resulted in the affray, and defendant was at the time aware that such difficulty had arisen by reason of the acts which he had so aided and advised, then his act in killing the deceased was not justifiable.*" The portion of the instruction excepted to is italicized.

One's right of self-defense may be abridged or impaired by his own wrongful act, and the court doubtless had this in view when it gave both the second and sixth instructions. Section 721, General Statutes, provides: "If a person kills another in self-defense it must appear that the danger was so urging and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing of the other was absolutely necessary. *And it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow is given.*" This section is but a re-enactment of a common-law rule, and the reasons upon which it is founded are variously stated. Sergeant Hawkins says: "Neither shall a man, in any case, justify the killing of another by the pretense of necessity, unless he were himself wholly without fault in bringing the necessity

upon himself. If a man, in defense of an injury done by himself, kill any person whatsoever, he is guilty of manslaughter at least." 1 Hawk. P. C. c. 28.

In *Stoffer v. State*, 15 Ohio St. 47, it is said: "While he who made the first assault remains in the conflict, to whatever extremity he may be reduced, he cannot be excused for taking the life of his antagonist to save his own. In such case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct." In the case of *Rippy v. State*, 2 Head, 217, it is said: "Real or apparent necessity, brought about by the design, contrivance or fault of the defendant, is no excuse." In the case of *Adams v. State*, 47 Ill. 376, the principle is stated thus: "The defendant cannot avail himself of necessary self-defense if the necessity for that defense was brought on by the deliberate, lawless act of the defendant in bantering Bostick to fight for the purpose of taking his life, or committing a deadly harm upon him, and in which he killed Bostick by the use of a deadly weapon." In the case of *State v. Neeley*, 20 Iowa, 108, the court say: "What we mean is that if the prisoner, with a loaded weapon, sought the deceased with a view of provoking a difficulty, and with the intent of having an affray, and a difficulty did ensue, he cannot, without some proof of a change of conduct or action, excuse the homicide on the ground that the deceased fired the first shot." In the case of *State v. Linney*, 52 Mo. 40, we find the rule stated in a case where a father had interfered in behalf of his son: "A party who seeks a difficulty cannot avail himself of the doctrine of self-defense, nor in such case would the father be justified in killing the adversary of his son, provided the son had provoked or brought on the conflict in which the son was so placed in imminent danger during the progress thereof; provided, always, that the father knew that his son had sought or brought on the difficulty." See, also, Whart. Hom. § 432, and cases cited; Horr. & T. Cas. 220, and cases cited.

Where a known felony is attempted upon a person, the party assaulted may repel force by force, and any other person present may interpose for preventing mischief, and if death ensue the party so interposing will be justified. The right thus to assist applies with peculiar force where a relationship exists, such as father, son, brother or husband. 2 Whart. Crim. Law, 975; Whart. Hom. § 532; 1 Bish. Crim. Law, § 872. It will be seen, however, by the doctrine of the case last cited, that the rights of one interfering are affected by the principle which we have quoted, if he knew that the party in whose behalf he interposed was the assailant.

Regarding the foregoing principle as applicable, it is to be supposed the court below gave the second and sixth instructions. The question is presented: Was William Bush in the position of one who had brought on an affray by his own unlawful act, and had thereby lost, both for himself and the accused interfering in his behalf, the right to interpose as a defense the plea that the killing was necessary in order to protect his life? The court, in the second instruction, speaks of William Bush as having committed an "act which resulted in the affray," and there is a contention as to what act the court here alludes. William Bush, in his testimony, says: "I think I did testify that way; I went there to throw that building off that was built in the night, regardless of who put it up, and who was there. * * * I expect I would have put it off; there was nobody in possession there, but I think I did intend to use physical force if necessary; I suppose if I had been interfered with I might have had a fight; I went there, probably, to get my rights — to have a fight if one should come; I was not any more prepared for it than I am now — my hands and fists; that is all I ever use. * * * I didn't know who was there; I didn't care; I was going to get what belonged to me — the lot; I was going to throw the cabin off; if any one had resisted me, I suppose I would have tried to throw it off anyway."

Whatever may have been William Bush's intention, it does not appear, as a matter of fact, that after arriving on the lot he did use any physical force for the purpose of removing the cabin. The temporary fence which deceased and Hopewell had erected was kicked down by Shute; I find no evidence that ascribes this act to William Bush. It was also Shute who picked up the handspike or piece of scantling, and approached the cabin with the purpose of throwing it over. From this purpose, however, Shute desisted as soon as the deceased told him that if he, Shute, had the title, he, the deceased, would remove the cabin himself. Thereupon Shute threw down the handspike and walked off some little distance to the south. This was the extent of the force used looking to the removal of the cabin and fence erected by the deceased from the lot, and these acts were exclusively the acts of Shute. While William Bush was present, and without doubt in full sympathy with Shute, he appears to have confined himself to talking. At this point the controversy seemed to be in a fair way for amicable adjustment. Its renewal seems to have been due to the insulting epithet applied by Bush to the deceased, who thereupon, saying that no one could call him *that*, or words to that effect, threw himself into a fighting attitude with his fists up, and, according to some of the witnesses, struck at Bush. Bush returned the blow, and it is claimed by the defense that at this time the deceased stepped back and put his hand in his hip-pocket, or drew it back towards his hip-pocket, as if to draw a pistol or knife. Thereupon, claiming that he believed his brother's life was in danger, James Bush, the accused, fired the shot which killed the deceased.

William Bush had entered upon the lot with the intention, as he says, of protecting his rights, and of removing the cabin therefrom. It is reasonably clear that this was the act to which the court alluded in the second instruction. Aside from entering upon the lot, William

Bush, as we have seen, had used no physical force in removing the cabin and fence. His insulting language to the deceased cannot properly be denominated an act, nor was it an assault. There is testimony to the effect that when William Bush applied to the deceased the insulting epithet mentioned "he had his hands up as if he was going to fight," but upon this point the testimony was conflicting, and, as a fact, it was controverted. It is not, therefore, to be supposed that the court referred to this act as "the act which resulted in the affray." It would have been error to have done so. I think the court intended by the language used the act which is clearly pointed out and designated in the sixth instruction, namely, the act of entering upon the lot "for the purpose of forcibly ejecting any person that might be in possession thereof, or, without the consent of such person, removing the shanty erected the night preceding." If this be not true, then the instruction was inapplicable to any fact in evidence. If this view be correct, then the two instructions present substantially the same proposition, and must share the same fate. In this view, and as no doubt exists as to what the court intended to say, and does say, in the sixth instruction, we address ourselves to the consideration of its correctness. The instruction is as follows: "If you believe beyond a reasonable doubt from the evidence that defendant, in company with his brother, went upon the lot for the purpose of forcibly ejecting any person that might be in possession thereof, or, without the consent of such person, removing the shanty erected the night preceding, or if defendant did not go upon the lot in company with his brother, but, for the purpose of aiding in said common design, came around said lot within a short time after his brother and others, and, while he was so upon the lot for the purpose aforesaid, William H. Bush and the deceased came to blows, or were about to engage in a fight, and thereupon defendant shot and killed deceased, you will find him guilty."

This instruction contains two distinct propositions; the first relates to the entry upon the lot for the purpose of forcibly ejecting any person that might be in possession thereof, and the second relates to the entry upon the lot *for the purpose of removing the shanty erected thereon the night preceding, without the consent of the persons who erected it.* As the second proposition is the one most strenuously questioned, it will be first considered. It is well settled that a bare trespass against the property of another is not sufficient provocation to warrant the owner in using a deadly weapon in its defense, and if he do so, and with it kill the trespasser, it will be murder, and this though the killing were actually necessary to prevent the trespass. 2 Whart. Crim. Law, § 975, and cases cited. The rule is the same whether the trespass be upon real or personal property; the law does not justify the shedding of human blood to prevent slight injuries to the property of others. Russ. Crimes, 520; Arch. Crim. Pr. § 308; *State v. Zellers*, 7 N. J. Law, 220; *State v. Drew*, 4 Mass. 395; *State v. Kennard*, 8 Pick. 133; *State v. Morgan*, 3 Ired. 186; *Oliver v. State*, 17 Ala. 598.

It is clear that the homicide in this case cannot be justified on the ground that the deceased was a trespasser. Had the deceased been the owner of the lot upon which the homicide took place, and William Bush and the accused mere naked trespassers, it is equally clear that the deceased would not have been justified in taking their lives, or in assaulting either of them with that intent. In this connection, so far as we can see from the testimony, Bush was the equitable owner of the lot, had purchased it from the legal owner, and had been put in possession, and retained possession through tenants who paid him rents.

"The general doctrine is, that while a man may use all reasonable and necessary force to defend his real and personal estate, of which he is in the actual possession, against another who comes to dispossess him without

right, he cannot instantly carry his defense to the extent of killing the aggressor. If no other way is open, he must yield, and get himself righted by resort to the law." 1 Bish. Crim. Law, § 857, and cases cited. See, also, § 536, and cases cited.

" An assault and battery may be justified as inflicted in defense of one's property. Yet, consistent with this proposition is another, that one in the defense of his property should not resort to means reasonably calculated to endanger life." 1 Bish. Crim. Law, § 361, and cases cited. The doctrine is well stated in the case of *State v. Morgan*, 3 Ired. 188: "You may not kill because you cannot otherwise effect your object, although the object sought to be effected is right. * * * The purpose is, indeed, rightful, but it is not one of such paramount necessity as to justify a resort to such desperate means. So it is clear that if one man deliberately kills another to prevent trespass upon his property, whether that trespass could or could not otherwise have been prevented, he is guilty of murder. *If, indeed, he had used moderate force, and this had been returned with such violence that his own life was in danger, and then he killed from necessity, it would have been excusable homicide, not because he can take life to save his property, but he might take the life of his assailant to save his own.*"

From the authorities which we have cited it is clear that while the owner of property may not commit a homicide for the purpose of protecting it against a trespasser, he is not bound to a passive submission, which neither remonstrates nor resists. Under the condition of title as stated by Bush, both he, and Shute at his request, had a right to go to the lot and to enter upon it for the purpose of removing therefrom both the cabin and the fence erected by the deceased and Hopewell. To what extent they or either of them, if resisted, might have used force it is not necessary to say. The deceased and Hopewell appear to have arrived immediately after

Bush and Shute went upon the lot. Whatever the intention of William Bush, he stopped short of any act of physical force towards the removal of either cabin or fence, while Shute, if he is to be regarded as acting under the orders of William Bush, desisted from further acts, upon assurance from deceased that he would remove the cabin if he, Shute, had title. Had William Bush gone to the lot for the purpose of removing the shanty, with the ulterior purpose of thereby bringing on an affray with the intention of taking the life of the deceased, and after arriving at the lot had acted in pursuance of said purpose, and the accused, James Bush, had been present, aiding and abetting him in this felonious purpose, a different question would have been presented. This, however, was not the case presented by the evidence; nor is the instruction we are considering based upon the existence of any such intention upon the part of William Bush. On the other hand, the court tells the jury, broadly and without qualification, in substance, that if they should find that William Bush went upon the lot for the *purpose of removing the shanty erected by the deceased and Hopewell, without their consent, and that the accused, James Bush, was aiding and abetting in that design, they must find him guilty.* This certainly was error. It is not the law that the owner of real property, in possession through his tenants, may not go to it, and upon it, for the purpose of remonstrating with a trespasser thereon, and for the further purpose of removing therefrom structures erected upon it by a trespasser, without thereby, and without more, losing the right of defending himself if the trespasser make a murderous assault upon him. If the act of William Bush in this respect was lawful, it was lawful for the accused, James Bush, to aid therein. In this respect the jury were not correctly advised of the law. We do not say that the evidence shows that a murderous assault was committed upon William Bush, his brother, which justified the kill-

ing of the deceased by the accused.    This was the defense which the accused interposed.    There was some evidence in support of it, and the question of his guilt or innocence upon the defense made should have been submitted to the jury upon proper instructions.

Whether the accused, James Bush, had reasonable ground to believe his brother's life was in danger, or that he was about to suffer great bodily harm at the hands of the deceased, and whether he really acted under the influence of such fears, and not in the spirit of revenge, were the principal questions presented, upon the determination of which depended the guilt or innocence of the accused.    I think that these questions were fairly and correctly submitted to the jury in the first part of the second instruction, and it is to be regretted that the concluding paragraph of the instruction, as well as the sixth instruction, practically deprived the prisoner of his rights under the law as stated, and left the jury at liberty to find him guilty upon another and entirely erroneous proposition

The judgment of the court below is reversed and the cause remanded for a new trial.

HELM, J., did not sit in this case.

*Reversed.*