The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 9, 2019

## 2019COA68

**No. 16CA1988, *People v. Galvan* — Constitutional Law — First Amendment — Freedom of Speech — Fighting Words; Criminal Law — Jury Instructions — Defenses — Use of Non-Deadly Physical Force (Defense of Person) — Provocation Exception**

The division holds that a defendant's taunts at the alleged victims were fighting words and, thus, were not protected by the First Amendment. Those words, therefore, could be considered in determining whether there was some evidence that the defendant provoked the victims, thereby authorizing the giving of a provocation instruction.

The division also concludes that a prosecutor may not imply to a jury venire that the alleged victims have rights that are equal to, or in conflict with, the rights of the criminal defendant.

COLORADO COURT OF APPEALS                    **2019COA68**

Court of Appeals No. 16CA1988
Weld County District Court No. 15CR554
Honorable Marcelo A. Kopcow, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jose Luis Galvan, Sr.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BERGER
Taubman and Tow, JJ., concur

Announced May 9, 2019

Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney
General, Colleen Wort, Assistant Attorney General Fellow, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith E. Osborne, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      A jury convicted Jose Luis Galvan, Sr., of second degree assault. Galvan appeals, contending that the trial court erred in (1) instructing the jury on the provocation exception to self-defense; (2) not giving a self-defense instruction for each alleged victim; (3) failing to give a separate no duty to retreat instruction; and (4) permitting the prosecutor to suggest to the jury during voir dire that the alleged victims had rights to a fair trial that were equal to that of Galvan's. Because no reversible error infected the judgment, we affirm.

## I.     Relevant Facts and Procedural History

¶ 2      One night, Galvan and his sister took a "party bus" from Greeley to Denver. There were numerous other people on the bus, including S.M. and her sister, C.M. (the alleged victims). Everyone in the group was drinking heavily, with the exception of Galvan's sister.

¶ 3      While in Denver, the group visited three or four bars and continued to drink heavily. By the time the group returned to the bus to head back to Greeley, everyone was highly intoxicated (except Galvan's sister). On the way back to Greeley, Galvan and

1

S.M. began to argue — though the reason the argument began was disputed.

¶ 4    S.M. testified that she saw Galvan throwing pieces of food at another partygoer who was asleep on the bus.  S.M. told Galvan to stop, but he persisted.  S.M. then told Galvan to "knock the fuck off," to which he responded, "What are you going to do about it bitch?"  The two continued shouting at each other, and Galvan stood up and again said, "What the fuck are you going to do about it bitch?"  He then took a step toward S.M., and both she and C.M. stood up in response.  At that point, the bus driver intervened and told the group that if they did not stop arguing, they would be walking home to Greeley.  They temporarily stopped.

¶ 5    Galvan's sister's testimony painted a very different version of these initial events.  Galvan's sister testified that throughout the evening, C.M. had been making sexual comments to her, making her uncomfortable.  At one of the bars in Denver, C.M. asked the sister to dance.  When the sister said no, C.M. told her she needed a "shot" to loosen up and relax a little bit.  The sister declined the drink.  When C.M. asked the sister to dance again sometime later,

2

the sister agreed. But, while on the dance floor, C.M. touched the sister and made her uncomfortable. The sister told Galvan that she wanted to leave. She and Galvan called some friends to see if anyone was in Denver who could give them a ride back to Greeley. No one answered. So, when the group boarded the bus to head back to Greeley, Galvan and his sister were on the bus.

¶ 6 Again, according to the sister, C.M. sat next to her and continued to make sexual comments to her. At one point, C.M. touched the sister's breast. Galvan slapped C.M.'s hand away and pushed her to the side. According to the sister, that is when the situation escalated. C.M. and S.M. started yelling at Galvan and telling him that his sister could make her own decisions. At that point, Galvan stood up and began yelling at S.M. and C.M. S.M. and C.M. responded in kind.

¶ 7 Sometime later, Galvan's sister noticed a different partygoer throwing pieces of food at the sleeping partygoer. When one piece of food landed on Galvan, he flicked it off himself, and it landed on the sleeping woman. S.M. and C.M. saw the food hit the sleeping woman and reinitiated the argument. C.M. then grabbed Galvan by

the shirt and said, "Listen, I'm not scared of you.  We can fight if you want.  You know, I'll fight with you.  I don't care."  At that point, the bus driver intervened, and the fighting again stopped temporarily.

¶ 8    After returning to Greeley, the group exited the bus, but the altercation among Galvan, S.M., and C.M. continued.  S.M. testified that they continued shouting at each other, and Galvan shouted at S.M. and C.M. that they "were going to get it" and should "watch [their] backs."  S.M. and C.M. started walking down the street to their aunt's house.

¶ 9    According to S.M., as they walked, Galvan drove slowly by them shouting "[i]f any of you want this, well, come and get it."  Then, Galvan stopped his truck, got out, and started running toward C.M. with his fist cocked, as if ready to punch.  Galvan then punched C.M. in her face, breaking her nose and causing her to fall.  During her fall, C.M. broke her ankle.  S.M. then went after Galvan and the two physically fought.

¶ 10    Galvan's sister testified differently.  As she and Galvan drove away from the bus, she heard something hit the truck.  She

believed that C.M. had hit the truck with a bottle, so Galvan stopped the truck, and the sister got out to see if there was any damage. While she was checking the truck, S.M. and C.M. came up behind her and S.M. shoved her. The sister saw C.M. over her shoulder and then saw a fist. The next thing she knew, C.M. was on the ground, bleeding from her face. Then S.M. and Galvan fought. Finally, Galvan and his sister left the scene.

¶ 11　　After a police investigation, Galvan was charged with second degree assault against C.M.; and menacing, criminal attempt to commit assault in the second degree, and assault in the third degree against S.M. The jury acquitted Galvan of all charges against S.M., but convicted him of second degree assault against C.M.

## II.　The Court Did Not Err in Instructing the Jury on Self-Defense or the Duty to Retreat

¶ 12　　At Galvan's request, the trial court instructed the jury on the affirmative defense of self-defense using the Colorado Model Criminal Jury Instructions. COLJI-Crim. H:11 (2018). But the court, over Galvan's objection, also instructed the jury on the provocation exception to self-defense. Galvan claims this was error

because there was no evidence that supported the provocation exception.

¶ 13    Galvan also raises two additional contentions of error regarding the self-defense instruction and the related concept of retreat.  First, he argues that the self-defense instruction was defective because it did not distinguish between the two alleged victims.  Second, he contends that the court improperly rejected his tendered "no retreat" instruction.  We address each of these contentions in turn.

### A.    Additional Relevant Facts

¶ 14    As to self-defense, the trial court instructed the jury as follows:

> The evidence presented in this case has raised the affirmative defense of "defense of person," as a defense to Assault In The Second Degree, Criminal Attempt to Commit Assault In The Second Degree, Menacing, and Assault In The Third Degree.
>
> The defendant was legally authorized to use physical force upon another person without first retreating if:
>
>> 1. he used that physical force in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and

6

2. he used a degree of force which he reasonably believed to be necessary for that purpose, and

3. he did not, with intent to cause bodily injury or death to another person, provoke the use of unlawful physical force by that other person.

The prosecution has the burden to prove, beyond a reasonable doubt, that the defendant's conduct was not legally authorized by this defense. In order to meet this burden of proof, the prosecution must disprove, beyond a reasonable doubt, at least one of the above numbered conditions.

. . . .

¶ 15   At the jury instruction conference, Galvan objected to giving the instruction as written, arguing that there was no evidence of provocation by him. As to C.M., the prosecutor agreed that there was no evidence of provocation. The trial court disagreed, stating that it believed there was some evidence of provocation as to both alleged victims. Thus, the trial court instructed the jury on provocation.

¶ 16   Galvan also tendered a separate "no duty to retreat" instruction and argued that it was necessary because otherwise the jury might conclude, contrary to established Colorado law, that

7

Galvan had a duty to retreat. The prosecution objected to a separate no duty to retreat instruction, arguing, successfully, that the substance of the no duty to retreat instruction was already encompassed in the model self-defense instruction.

### B. The Trial Court Did Not Err in Instructing the Jury on Provocation

#### 1. Judicial Estoppel

¶ 17    Initially, Galvan argues that the Attorney General cannot argue on appeal that there was any evidence to support the provocation instruction because, at trial, the prosecutor agreed with Galvan that there was no evidence of provocation as to C.M.

¶ 18    We take this to be an argument that the Attorney General is judicially estopped from arguing on appeal that there was sufficient evidence to support the provocation instruction. Applying the established law of judicial estoppel, we reject that argument.

¶ 19    Judicial estoppel is a doctrine that "prevents a party from taking inconsistent positions in related court proceedings with intent to mislead the court." *Janicek v. Obsideo, LLC*, 271 P.3d 1133, 1140 (Colo. App. 2011). The elements of judicial estoppel are

1. The two positions must be taken by the same party (or parties in privity with each other);

2. the positions must be taken in the same or related proceedings involving the same parties;

3. the party taking the positions must have been successful in maintaining the first position and must have received some benefit in the first proceeding;

4. the inconsistency must be part of an intentional effort to mislead the court; and

5. the two positions must be totally inconsistent — that is, the truth of one position must necessarily preclude the truth of the other.

*Arko v. People*, 183 P.3d 555, 560 (Colo. 2008) (citing *Estate of Burford v. Burford*, 935 P.2d 943, 948 (Colo. 1997)).

¶ 20    For two reasons, the Attorney General is not judicially estopped from defending the trial court's decision to instruct the jury on provocation.  First, there is no evidence of an intent to mislead the court (and Galvan does not argue that there was).  Second, the prosecution did not receive a benefit in the first

proceeding based on its position.  *See Arko*, 183 P.3d at 560.[1]

Because the judicial estoppel argument fails on two elements, we

need not address the remaining elements.

### 2.	The Standard for Giving a Provocation Instruction

¶ 21	The first question is what quantum of proof is necessary to

authorize an instruction on one of the statutory exceptions to self-

defense.  The supreme court has not spoken authoritatively on this

question, although in a recent case it assumed, without deciding,

that the quantum of proof was "some evidence."  *Castillo v. People*,

2018 CO 62, ¶ 37.  At least two divisions of this court have applied

the same quantum of proof standard.  *People v. Castillo*, 2014 COA

---

[1] Nor was the prosecutor's statement a judicial admission.  "A judicial admission is a formal, deliberate declaration that a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters . . . ."  *People v. Curren*, 228 P.3d 253, 257 (Colo. App. 2009).  Here, the prosecutor was not "dispensing with proof of [a] formal matter[]," *id.*, but instead was commenting on the evidence presented at trial for the purposes of crafting a jury instruction.  Such a comment does not meet the requirements of a judicial admission.

Evaluating the prosecutor's statement to the trial court as a concession on the question of whether there was some evidence of provocation, we are not bound by that concession.  *People v. Backus*, 952 P.2d 846, 850 (Colo. App. 1998).

10

140M, ¶¶ 20-21, *rev'd on other grounds*, 2018 CO 62; *People v. Zukowski*, 260 P.3d 339, 347 (Colo. App. 2010). Because we agree with those divisions, we apply that standard here.

¶ 22     "Whether sufficient evidence exists to support the requested instruction is a question of law that we review de novo." *Castillo*, ¶ 32. We view the evidence in the light most favorable to the giving of the challenged instruction. *People v. Silva*, 987 P.2d 909, 914 (Colo. App. 1999).

¶ 23     An instruction on provocation is authorized when "1) self-defense is an issue in the case; 2) the victim makes an initial attack on the defendant; and 3) the defendant's conduct or words were intended to cause the victim to make such attack and provide a pretext for injuring the victim." *Id.* Thus, for a defendant to forfeit self-defense under the provocation exception, the defendant must act with the intent to provoke the victim into attacking first. *Id.*

   3.    Whether Colorado Law Requires More Than Words to Justify Giving a Provocation Instruction Need Not Be Decided in This Case

¶ 24     Galvan argues that "mere words are not such provocation as would eliminate one's right of self-defense." *People v. Winn*, 540

11

P.2d 1114, 1117 (Colo. App. 1975) (not published pursuant to

C.A.R. 35(f)); *see also Silva*, 987 P.2d at 914 (noting that "insulting

language is not a provoking incident" (citing *Bush v. People*, 10

Colo. 566, 16 P. 290 (1888))).

¶ 25     No published Colorado case has expressly determined

whether, under Colorado law, words alone are sufficient to support

the giving of a provocation instruction.[2]  Although *Silva* stated that

"the defendant's conduct *or* words" could justify the giving of a

provocation instruction, 987 P.2d at 914 (emphasis added), *Silva*

did not analyze whether words alone are sufficient to sustain a

provocation instruction.  At least one state's highest court has

determined that under its law, words alone are not enough.  *State v.*

*Riley*, 976 P.2d 624, 628 (Wash. 1999).  We need not decide this

question because, as discussed below, here both words *and*

conduct supported the provocation instruction.

---

[2] Whether provocation can be proved by words alone or whether
there must always be some conduct by the defendant is a matter of
Colorado law.  Federal constitutional law, however, determines
whether particular words may be used to establish provocation
consistent with the First Amendment.

### 4. The First Amendment Does Not Prohibit Some of Galvan's Words From Being Considered as Evidence of Provocation

¶ 26    Galvan next contends that consideration of his words to support the provocation instruction violates the First Amendment.

¶ 27    The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." Colorado's counterpart to the First Amendment provides that "[n]o law shall be passed impairing the freedom of speech." Colo. Const. art. 2, § 10.

¶ 28    We first address whether the First Amendment has any application in this context. The State did not criminally punish Galvan because of the words he uttered. But the State has, nevertheless, regulated his speech through the giving of the provocation instruction. By using his words (at least in part) to justify giving an instruction that limits his right to self-defense, the First Amendment was implicated.

¶ 29    While the First Amendment protects the right to free speech, its protection is not absolute. *Virginia v. Black*, 538 U.S. 343, 358 (2003). Some categories of speech, such as "fighting words" and "true threats" are unprotected by the First Amendment, and the

13

government may permissibly regulate that speech. *Id.* at 358-59; *see also People v. Chase*, 2013 COA 27, ¶ 68.[3]

¶ 30 The Supreme Court has defined fighting words as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, *inherently likely to provoke violent reaction.*" *Black*, 538 U.S. at 359 (emphasis added) (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)). That is, fighting words are those "which by their very utterance tend to incite others to unlawful conduct or provoke retaliatory actions amounting to a breach of the peace." *People In Interest of R.C.*, 2016 COA 166, ¶ 10 (quoting *Hansen v. People*, 190 Colo. 457, 461, 548 P.2d 1278, 1281 (1976)).

¶ 31 The First Amendment permits regulation of such words because "[i]t has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived

---

[3] The Attorney General does not argue that Galvan's statements constitute true threats, and because we determine that some of his words were fighting words and therefore not protected by the First Amendment, we do not address whether his statements also constituted true threats.

14

from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). However, "[t]he Supreme Court has 'never held that the government may, consistent with the First Amendment, regulate or punish speech that causes emotional injury but does *not* have a tendency to provoke an immediate breach of the peace.'" *R.C.*, ¶ 12 (quoting *Purtell v. Mason*, 527 F.3d 615, 624 (7th Cir. 2008)).

¶ 32    "[A] defendant's words are considered as a 'package' in combination with conduct and physical movements, viewed in light of the surrounding circumstances." *Id.* at ¶ 22 (quoting *In re Welfare of M.A.H.*, 572 N.W.2d 752, 757 (Minn. Ct. App. 1997)). Thus, whether speech constitutes fighting words must be determined on a case-by-case basis, considering all the particular facts and circumstances. *Id.*

¶ 33    Recently, another division of this court addressed whether a photograph, which had been altered to add a drawing of male genitalia close to a juvenile's face, constituted fighting words. *Id.* at ¶¶ 3, 7. The division's majority observed that "speech that embarrasses or disgraces another is insufficient to qualify as

15

fighting words. Even vulgar and insulting speech that is likely to arouse animosity or inflame anger, or even to provoke a forceful response from the other person, is not prohibited." *Id.* at ¶ 18.

¶ 34     That R.C.'s conduct "was not accompanied by any hostile, aggressive, or threatening language or conduct" was also important to the majority's analysis. *Id.* at ¶ 24. The majority held that the image did not constitute fighting words because "the average person — even an average fourteen-year-old — would not be expected to fly into a violent rage upon being shown [such] a photo of himself . . . . " *Id.* at ¶ 32.

¶ 35     While we agree with the exposition of law in the majority opinion in *R.C.*, the circumstances here are factually distinguishable from those in *R.C.* Unlike in *R.C.*, Galvan's words reasonably could be understood as inviting S.M. and C.M. to "make such attack and provide a pretext for injuring" C.M. *Silva*, 987 P.2d at 914. This invitation is encapsulated in the following words and actions, at least according to some of the testimony:

- During the argument on the bus, in response to S.M. telling him to stop throwing pieces of food at the sleeping

16

partygoer, Galvan stood up and said, "What the fuck are you going to do about it bitch?" then "stepped forward" toward S.M. and C.M., who stood up in response.

- Galvan and his sister got in his truck, but he continued yelling at S.M. and C.M. that they were "nothing but a bunch of fat, fucking bitches," "were going to get it," and should "watch [their] backs."

- As Galvan drove slowly down the street, he yelled: "If any of you want this, well, come and get it."

- And then he "all of a sudden stop[ped] his truck," got out, and started running toward C.M. with his fist cocked, as if ready to punch.[4]

¶ 36    Not all of Galvan's statements constitute fighting words.[5]  His repeated statements that S.M. and C.M. were "big, fat bitches,"

---

[4] Galvan also yelled insults at the sisters, calling them "big, fat bitches" as everyone exited the bus.  However, for the reasons explained in the text, those insults do not rise to the level of fighting words.

[5] We note that there is no contention that any of Galvan's statements constitute political speech.  *Cf. Village of Skokie v. Nat'l Socialist Party of Am.*, 373 N.E.2d 21, 25-26 (Ill. 1978) (holding that the display of swastikas during a march through a community

though offensive, were not of such character as to incite the sisters to react violently. However, his invitation for S.M. and C.M. to "come and get it" was a direct invitation to violence and stands on a different footing. *State v. Bougneit*, 294 N.W.2d 675, 680 (Wis. Ct. App. 1980), supports our analysis. As in *Bougneit*, Galvan "invited [C.M. and S.M.] to fight and, in fact, taunted [them] with fighting words." *Id.*

¶ 37    Unlike *R.C.*, and the cases relied on by the majority there, Galvan did not merely call S.M. and C.M. names or make offensive comments. *See R.C.*, ¶¶ 23, 28. He also threatened S.M. and C.M. by telling them that they should "watch [their] backs," and then he invited them to respond with violence by yelling: "If any of you want this, *well, come and get it.*" (Emphasis added.)

¶ 38    Also, in contrast to R.C.'s speech, Galvan's words were uttered face-to-face with the alleged victims, and were relatively close in time to the physical altercation between him and C.M. *See People in Interest of R.D.*, 2016 COA 186, ¶ 19 (holding that because

inhabited by Holocaust survivors did not to amount to "fighting words" but instead was political speech).

statements made over the internet were not made face-to-face or in close physical proximity to the alleged victim, the statements did not constitute fighting words) (*cert. granted* Sept. 5, 2017).

¶ 39    The timing of Galvan's statements is important because one factor in determining if words are fighting words is whether they "tend[] to provoke an *immediate* breach of the peace."[6]  *R.C.*, ¶ 12 (emphasis added).  The evidence presented at trial showed that, at least, Galvan's statements made after the group exited the party bus — that C.M. and S.M. should "watch [their] backs," "were going to get it," and should "come and get it" — were in close temporal proximity to the physical altercation between C.M. and Galvan.

¶ 40    These specific words, taken in context and "in combination with [Galvan's] conduct and physical movements," *id.* at ¶ 22 (quoting *M.A.H.*, 572 N.W.2d at 757), were "inherently likely to provoke a violent reaction."  *R.D.*, ¶ 17 (quoting *People in Interest of K.W.*, 2012 COA 151, ¶ 30).  We conclude that these words were fighting words and thus are not protected by the First Amendment.

---

[6] The record is unclear regarding precisely how much time passed between when the group exited the party bus and when the physical altercation between Galvan and C.M. occurred.

Therefore, these words could properly be considered in determining whether *some* evidence supported the provocation instruction.

### 5. At Least Some Evidence Supported Giving the Provocation Instruction

¶ 41 Viewing the evidence in a light most favorable to giving the provocation instruction, *Silva*, 987 P.2d at 914, we conclude that there was at least *some* evidence that Galvan provoked C.M. *See Zukowski*, 260 P.3d at 347. Based on the evidence presented, a reasonable juror could have found that Galvan's actions and statements, discussed above, were intended to give him an excuse to physically harm C.M.[7] Therefore, the trial court did not err in instructing the jury on the provocation exception.

### C. The Trial Court Did Not Abuse Its Discretion by Declining to Give A More Specific Provocation Instruction

¶ 42 Galvan also contends that the provocation instruction was defective because it did not specify to which victim it applied. We disagree.

---

[7] We emphasize that it is for the jury to determine whether Galvan in fact provoked C.M., not the trial court or this court. The trial court's role is that of gatekeeper, which is why the quantum of proof to authorize the provocation instruction is low.

20

¶ 43     To begin, the instruction tracked the language of the statute. "An instruction that tracks the language of the statute, as this one did, is generally sufficient." *People v. Archuleta*, 2017 COA 9, ¶ 52. It also tracked the language of the Colorado Model Criminal Jury Instructions.  *See* COLJI-Crim. H:11 (2018).

¶ 44     Galvan argues that "if the jury concluded that Mr. Galvan did not act in self-defense with respect to S.M. because he allegedly provoked her, it could have applied that finding to the second degree assault offense against C.M."  To the extent we understand his argument, we reject it.

¶ 45     The provocation instruction stated that Galvan did not act in self-defense if "with intent to cause bodily injury or death *to another person,* [he] provoke[d] the use of unlawful physical force by *that other person.*"  (Emphasis added.)  The plain language of the instruction itself made clear that for Galvan to forfeit the affirmative defense of self-defense, he had to have provoked the person as to whom he was asserting self-defense.

¶ 46     "Jury instructions must be read as a whole, and if, when so read, they adequately inform the jury of the law, there is no

21

reversible error." *People v. Vanrees*, 125 P.3d 403, 410 (Colo. 2005). Coupled with the other instructions that correctly informed the jury that it had to decide the affirmative defense of self-defense based on the totality of the circumstances, and that each crime charged was subject to the defense of self-defense, the self-defense instruction adequately and correctly instructed the jury on the applicable law. *See id.* Moreover, the jury was instructed to consider each charge separately and not let its decision on one charge influence its decision on the others. We presume the jury followed that instruction. *See People v. Phillips*, 91 P.3d 476, 484 (Colo. App. 2004) ("It is presumed the jury understood and heeded the trial court's instructions.").

### D. The Trial Court Did Not Abuse Its Discretion by Declining to Give a Separate No Duty to Retreat Instruction

¶ 47 Galvan next contends that the trial court abused its discretion in refusing to give his tendered instruction on "no duty to retreat." We disagree.

¶ 48 "We review de novo whether a jury instruction states the law correctly, and we review the trial court's decision to give a particular

22

jury instruction for an abuse of discretion." *Walker v. Ford Motor Co.*, 2017 CO 102, ¶ 9.

¶ 49     "The trial court must tailor the self-defense instructions to the particular circumstances of the case in order to adequately apprise the jury of the law of self-defense from the standpoint of the defendant." *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004). "In cases where the jury could reasonably conclude that the defendant had a duty to retreat before using force in self-defense, the defendant may be entitled to a self-defense instruction tailored to address the issue of retreat." *Id.* Still, a court may refuse an instruction that states principles already encompassed elsewhere in the court's instructions. *People v. Tweedy*, 126 P.3d 303, 307 (Colo. App. 2005).

¶ 50     The jury was instructed that Galvan "was legally authorized to use physical force upon another person *without first retreating . . . .*" (Emphasis added.) The instruction containing the "no retreat" language tracked the language of the model jury instruction. COLJI-Crim. H:11 (2018); *see also People v. Grenier*, 200 P.3d 1062,

1080 (Colo. App. 2008) (finding no error where the jury instruction tracked the language of the model jury instruction).

¶ 51    *Cassels*, 92 P.3d at 956, and *Idrogo v. People*, 818 P.2d 752 (Colo. 1991), are distinguishable because in those cases, *none* of the jury instructions told the jury that the defendant did not have a duty to retreat.  Both of those cases were decided before the model jury instructions specifically addressed the "no duty to retreat" principle embedded in Colorado law.  Thus, when the court stated in *Cassels* that "a standard self-defense instruction does not adequately apprise the jury that a defendant who is not the initial aggressor does not need to retreat before using force in self-defense," 92 P.3d at 956, the court was assessing instructions that did not address the duty to retreat.  The model jury instruction given in this case addresses that principle of law and, consequently, the jury was correctly instructed.

¶ 52    For these reasons, the trial court did not abuse its discretion by failing to give Galvan's tendered no duty to retreat instruction.

### III. The Prosecutor's Statements Regarding the Victims' Rights to a Fair Trial Were Harmless

¶ 53    Finally, Galvan argues that the trial court erred by allowing the prosecutor to suggest to potential jurors that the alleged victims had rights to a fair trial that were equal to Galvan's constitutional rights to due process and a fair trial.

### A.    Additional Facts

¶ 54    During voir dire, the prosecutor had the following colloquy with Jurors 2, 4, and 12:

> [PROSECUTOR]: Juror Number 2.  I'm going to switch gears again.  So the judge talked about the right to a fair trial.  And, of course, we know that the defendant has a right to a fair trial.  Part of that is the presumption of innocence.  *My question, though, is what about the victim's right to a fair trial?  What do you think about that?*
>
> JUROR NUMBER 2: I think it's important that they --

(Emphasis added.)  Galvan's counsel objected, and the court overruled the objection.  The potential juror continued:

> JUROR NUMBER 2: I think the victim has a right to have the -- all the facts put out and the correct conclusions found by the jury.

25

¶ 55    Later, the prosecutor again asked about the victims' rights to a fair trial.

> [PROSECUTOR]: Juror Number 4. I want to come back to this right of a fair trial. And, you know, the defendant is going to sit before you for the next few days, *there's not going to be a victim sitting at my table or even in the courtroom. What [are] your thoughts of the victim's right to a fair trial?*

(Emphasis added.) Galvan's counsel again objected, and the court again overruled the objection. The potential juror then answered:

> JUROR NUMBER 4: They deserve a fair trial, as well, and have their side heard.

¶ 56    Sometime later, in speaking with Juror 12, the prosecutor said:

> [PROSECUTOR]: I realize this has now kind of drug [sic] on for a while, so I don't want to repeat myself. I just want to know if you have any thoughts on — we've talked about several issues; alcohol consumption, *the victim's right to a fair trial*, the issue of man versus woman in self-defense, any of those issues. Do you have any specific thoughts that you think we should all be aware of?

> JUROR NUMBER 12: No, I don't.

(Emphasis added.) Jurors 4 and 12 served on Galvan's jury.

B.    Standard of Review and Applicable Law

¶ 57    Our review of a claim of prosecutorial misconduct involves a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the conduct at issue was improper based on the totality of the circumstances. *Id.* If we determine there was misconduct, we next determine whether the misconduct warrants reversal under the applicable standard of reversal. *Id.*

¶ 58    In determining whether prosecutorial misconduct has occurred, "[t]he context in which [the] challenged prosecutorial remarks are made is significant." *People v. Krueger*, 2012 COA 80, ¶ 50 (quoting *People v. Santana*, 255 P.3d 1126, 1133 n.5 (Colo. 2011)). A prosecutor engages in prosecutorial misconduct during voir dire when she misstates the law or "intentionally use[s] the voir dire to present factual matter which the prosecutor knows will not be admissible at trial or to argue the prosecution's case to the jury." *People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985) (emphasis omitted) (quoting I ABA Standards for Criminal Justice § 3-5.3(c) (2d ed. 1980)).

27

## C. A Prosecutor May Not State or Imply that a Victim's Rights are Equal to the Rights of the Criminal Defendant

¶ 59 Although no Colorado court has addressed whether a prosecutor may properly suggest to a jury venire that a victim's rights under the Colorado Constitution, Colo. Const. art. 2, § 16a, and sections 24-4.1-301 to -303, C.R.S. 2018, are equal to those of a criminal defendant, courts in other states have addressed this question under those states' laws.

¶ 60 For example, the Arizona Supreme Court concluded that "[i]t cannot be doubted that victims of crime, and their families, have certain rights. It is equally clear, however, that these rights do not, and cannot, conflict with a defendant's right to a fair trial." *State v. Bible*, 858 P.2d 1152, 1205-06 (Ariz. 1993) (citations omitted). Similarly, the New Mexico Court of Appeals held, in addressing claims of prosecutorial misconduct, that "[p]rosecutors should not suggest that a victim's rights . . . can outweigh a defendant's

28

constitutional rights." *State v. Dombos*, 180 P.3d 675, 686 (N.M. Ct. App. 2008).[8]

¶ 61     We agree with these courts. Although the alleged victims in this case have certain constitutional and statutory rights, Colo. Const. art. 2, § 16a; §§ 24-4.1-301 to -303, those rights do not rise to the same level and cannot conflict with Galvan's constitutional rights to due process and a fair trial under the United States Constitution. U.S. Const. amends. V, VI.

---

[8] Still other courts have addressed (in a more cursory manner) circumstances where the prosecutor made a comparison between the rights of the victim and the rights of the criminal defendant. All of these courts found the comments improper, yet concluded reversal was not required. *See McNair v. State*, 653 So. 2d 320, 337 (Ala. Crim. App. 1992) (holding that despite the fact that "[t]he prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the [defendant's]," the error was not reversible); *Jennings v. State*, 453 So. 2d 1109, 1113-14 (Fla. 1984) (concluding that it was improper for the prosecutor to "compare[ the defendant's] right to use the telephone to call an attorney during his interrogation and the victim's right to live"), *vacated on other grounds*, 470 U.S. 1002 (1985); *State v. Marshall*, 586 A.2d 85, 171 (N.J. 1991) (holding that the prosecutor's comment that the victim "had a right to live her life in full" was harmless beyond a reasonable doubt); *Bell v. State*, 724 S.W.2d 780, 802-03 (Tex. Crim. App. 1986) (concluding that the error in allowing the prosecutor's comment on the victims' constitutional rights was not reversible).

¶ 62     The prosecutor never explicitly stated that the alleged victims'

rights were equal to or greater than Galvan's.  But, to the extent the

prosecutor's statements implied such an equivalence, the

prosecutor should not have made, and the trial court should not

have permitted, such statements.

### D.    Any Error Was Harmless

¶ 63     Even if a fair inference of the prosecutor's remarks was that

the victims' rights were equal to, or in conflict with, Galvan's rights,

any error was harmless.  The jury was properly instructed regarding

Galvan's constitutional right to a fair trial, and on the presumption

of innocence.  The trial court gave no instruction regarding the

alleged victims' rights to a fair trial.  Nor did the prosecutor mention

the alleged victims' rights again during trial.  So, the prosecutor's

statements, if improper, did not "substantially influence[] the

verdict or affect[] the fairness of the trial proceedings."  *Hagos v.

People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338,

342 (Colo. 1986)); *see also Bible*, 858 P.2d at 1206 (determining

that the prosecutor's statements equating the victim's rights with

the defendant's were not "fundamental error").

¶ 64 Moreover, the split verdicts in this case demonstrate that the jury followed the court's instructions, which, as noted, correctly instructed the jury regarding Galvan's constitutional rights.

## IV. Conclusion

¶ 65 The judgment is affirmed.

JUDGE TAUBMAN and JUDGE TOW concur.