**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 19-4496**

UNITED STATES OF AMERICA,

                Plaintiff – Appellee,

     v.

JULES A. BARTOW,

                Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T.S. Ellis, III, Senior District Judge.  (1:19-cv-00100-TSE-TCB-1)

Argued:  December 10, 2020                  Decided:  May 11, 2021

Before MOTZ, THACKER, and QUATTLEBAUM, Circuit Judges.

Reversed and remanded by published opinion.  Judge Motz wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.

**ARGUED:**  Richard William Redmond, CLEARY, GOTTLIEB, STEEN & HAMILTON LLP, Washington, D.C., for Appellant.  Daniel Taylor Young, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Frances H. Pratt, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. G. Zachary Terwilliger, United States Attorney, Aidan Taft Grano, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Jules A. Bartow challenges his criminal conviction for using "abusive language" in violation of Virginia Code § 18.2-416, as assimilated by 18 U.S.C. § 13. The First Amendment permits criminalization of "abusive language," but only if the Government proves the language had a direct tendency to cause immediate acts of violence by the person to whom, individually, it was addressed. The ugly racial epithet used by Bartow undoubtedly constituted extremely "abusive language." But because the Government failed to prove (or even to offer evidence) that Bartow's use of this highly offensive slur tended to cause immediate acts of violence by anyone, his conviction cannot stand. Accordingly, we must reverse and remand the case to the district court to vacate Bartow's conviction and sentence.

I.

In November 2018, retired Air Force Lieutenant Colonel Jules A. Bartow, who is white, entered the Quantico Marine Corps Exchange to shop for boots. The entirety of the evidence offered by the Government to prove its case against Bartow consisted of a store camera video (without audio) of the short encounter at issue here, and the testimony of two store employees as to their recollections of the events.[1]

---

[1] Because the video lacks audio and individuals move in and out of the frame, it is not possible to determine from the video when Bartow was talking or to whom he was looking when he did speak. For these reasons, the Government has primarily relied on the testimony of its two trial witnesses.

The first employee, Cathy Johnson-Felder, an African American, testified that she approached Bartow and said, "[G]ood morning. May I help you?" Bartow responded, "If I had indigestion, diarrhea, or a headache, would you still address me as good morning?" Bartow raised his voice to Johnson-Felder, who froze in shock. Johnson-Felder again asked Bartow, "[C]an I help you, sir?" He responded, "I'm not a sir — I'm not a male, I'm not a female, if I had a vagina, would you still call me sir?" Bartow gestured and pointed his finger several times at Johnson-Felder, who was a number of steps away from him. She was "taken aback."

Bartow's raised voice drew onlookers, including a white uniformed Marine lieutenant colonel. The lieutenant colonel began a conversation with Bartow, during which both men gestured at one another with pointed fingers. Bartow continued to try on boots throughout this exchange, as did the lieutenant colonel.

As the discussion continued, a few more people gathered around, including an African American man in civilian clothes. Johnson-Felder related that the civilian explained to Bartow that "the reason that [employees at the Exchange] say 'sir' or 'ma'am' is because you are purchasing merchandise on a military installation." Bartow then said: "If I called her a [n****r], would she still say good morning?" Johnson-Felder's testimony is unclear as to whether she believed this slur was directed to her or to the African American man in civilian clothes, or both.

In any event, Johnson-Felder, who remained several feet away from Bartow, asked another employee to call over Vicki Herd, a store security officer. Herd, the only other witness called by the Government at trial, testified that she was asked to go to the area

where shoes were sold to address "loud noises" and "people arguing." When Herd did so, she encountered Bartow on the floor trying on shoes and a white lieutenant colonel standing over Bartow and arguing with him. Herd could not recall exactly what Bartow said, but she testified that she did not hear him use the n-word. She did observe a "heated conversation" between Bartow and the white lieutenant colonel, who was "very animated" and pointed his finger at Bartow. Herd "moved between the two," and told Bartow to put on his shoes and leave the store. She escorted Bartow out and base security officers arrested him.

Bartow pled not guilty to violating Virginia Code § 18.2-416, and the case proceeded to trial before a magistrate judge. Following presentation of the evidence set forth above, the magistrate concluded that Bartow "directed [the slur] at an African American man who was talking to him." The judge did not make any findings as to whether the African American man was in fact likely spurred to immediate violence or as to the likelihood of such a response from an individual in the man's position. The magistrate found Bartow guilty and fined him $500, the maximum penalty under the Virginia statute.

On appeal, the district court affirmed. The court did not discuss to whom Bartow directed the epithet. The court seemed to rely on the apparent friction between the white lieutenant colonel and Bartow as a basis for concluding that Bartow's use of the n-word "elicited an impending breach of the peace."

Bartow noted a timely appeal to this court.

II.

This case requires us to determine whether the Government offered sufficient evidence to prove that Bartow violated Virginia Code § 18.2-416. That statute provides:

> If any person shall, in the presence or hearing of another, curse or abuse such other person, or use any violent abusive language to such person concerning himself or any of his relations, or otherwise use such language, under circumstances reasonably calculated to provoke a breach of the peace, he shall be guilty of a Class 3 misdemeanor.

Va. Code Ann. § 18.2-416.

The Supreme Court of Virginia has limited the sweep of § 18.2-416 to abusive language that has "a direct tendency to cause acts of violence by the person to whom, individually, [the language is] addressed." *Mercer v. Winston*, 199 S.E.2d 724, 726 (Va. 1973). As such, the statute only criminalizes "personal, face-to-face, abusive and insulting language likely to provoke a violent reaction and retaliation." *Id.* This "narrow construction," Virginia courts have recognized, is required to harmonize the statute with the First Amendment's guarantee of freedom of speech. *See Hershfield v. Commonwealth*, 417 S.E.2d 876, 877 (Va. Ct. App. 1992).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Constitution shelters speech "without regard . . . to the truth, popularity, or social utility of the ideas and beliefs [that] are offered." *National Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 445 (1963). Accordingly, as Justice Marshall famously explained, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).

5

The Supreme Court has held, however, that there are a few types of narrowly defined speech (*e.g.*, obscenity, defamation, fighting words, fraud, incitement, and speech integral to criminal conduct) that may be restricted consistent with the First Amendment. *See United States v. Stevens*, 559 U.S. 460, 468 (2010). As relevant here, the Court has long excluded "fighting words" from First Amendment coverage.

In 1942, in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942), the Court defined "fighting words" as words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572. The *Chaplinsky* Court concluded that "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution" and so may be punishable "as a criminal act" despite the First Amendment's general prohibition on the criminalization of speech. *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309–10 (1940)).

If this remained the Supreme Court's teaching on the contours of the "fighting words" exception, Bartow's abhorrent slur would undoubtedly constitute a "fighting word" punishable "as a criminal act." *Id.* But in the decades since *Chaplinsky*, the Court has imposed a number of limitations on the "fighting words" exception to First Amendment protection.

First, the Court has effectively eliminated the "inflict injury" prong of the "fighting words" analysis. *See generally Purtell v. Mason*, 527 F.3d 615, 623–24 (7th Cir. 2008) (tracing the demise of the "inflict-injury" prong, beginning with *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)). Now, the Government may only criminally prosecute as a "fighting word" speech "shown likely to produce a clear and present danger of a serious

6

substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello*, 337 U.S. at 4.

Second, the Supreme Court has repeatedly indicated that the limiting construction adopted by the New Hampshire court in *Chaplinksy* — forbidding only those words "that have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed" — must be read into any state law criminally punishing abusive language. *Gooding v. Wilson*, 405 U.S. 518, 524 (1972) (quoting *Chaplinksy*, 315 U.S. at 753)*; see also Cohen v. California*, 403 U.S. 15, 20 (1971); *Texas v. Johnson*, 491 U.S. 397, 409 (1989).

Third, the Court has explained that the "small class" of "fighting words" is limited to "direct personal insults" — statements clearly "'directed to the person of the hearer,'" who is "actually or likely to be present." *Johnson*, 491 U.S. at 409; *Cohen*, 403 U.S. at 20 (quoting *Cantwell*, 310 U.S. at 309). Without evidence of a direct personal insult, the Court has determined that the Government may not obtain a conviction for "fighting words." *Id.*

Fourth, the Supreme Court has clarified that even a ban on "opprobrious" and "abusive language" that provokes a "breach of the peace" and "violent resentment" in another person does not come within the "fighting words" exception to First Amendment protection. *Gooding*, 405 U.S. at 524. Rather, the "fighting words" exception applies only to "utterances where there was [a] likelihood that the person addressed would make an *immediate violent* response." *Id.* at 528 (emphasis added); *see also Johnson*, 491 U.S. at 410.

Finally, the Court has repeatedly stated that whether speech constitutes "fighting words" must be analyzed on a case-by-case basis. Courts must "consider[] the actual circumstances surrounding such expression." *Johnson*, 491 U.S. at 409; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 432 (1992) (Stevens, J., concurring) ("Whether words are fighting words is determined in part by their context.").

Taken together, these limitations, fully adopted by Virginia's highest court, have sharply curtailed the reach of the "fighting words" exception.[2] Of course, we must construe Bartow's statute of conviction, Virginia Code § 18.2-416, subject to these limitations.

In doing so, we review the magistrate's "[f]indings of fact . . . for clear error, and [conclusions] of law . . . *de novo*." *United States v. Bursey*, 416 F.3d 301, 305–06 (4th Cir. 2005). But, because "the limits of [an] unprotected category" such as "fighting words," must be "determined by the judicial evaluation of special facts that have been deemed to have constitutional significance," a reviewing court must conduct an "'independent examination' of the allegedly unprotected material." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505, 507–08 (1984) (quoting *New York v. Ferber*, 458 U.S. 747, 774 n.28 (1982)). Thus, an appellate court must conduct "an independent review of the

---

[2] Even accepting these confines, critics have called for interment of the "fighting words" exception. *See, e.g.*, *Feiner v. New York*, 340 U.S. 315, 327 n.9 (1951) (Black, J., dissenting) (questioning the wisdom of the exception); Kathleen M. Sullivan, *Foreword: The Justices of Rules and Standards*, 106 Harv. L. Rev. 22, 42 (1992) ("fighting words" exception is a "hopeless anachronism that canonizes the macho code of barroom brawls"); *see also* Note, *The Demise of the* Chaplinsky *Fighting Words Doctrine: An Argument for Its Interment*, 106 Harv. L. Rev. 1129 (1993). Nevertheless, the doctrine persists in Supreme Court *dicta* as one of the few exceptions to the First Amendment's prohibition against content-based restrictions on speech. *See, e.g.*, *Brown v. Entm't Merchs Ass'n*, 564 U.S. 786, 791 (2011); *Virginia v. Black*, 538 U.S. 343, 359 (2003).

record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits." *Id*. at 505.

We now turn to that task.

## III.

Virginia Code § 18.2-416 first requires proof of "abusive language." The magistrate judge found the epithet constituted abusive language. We have no difficulty agreeing that the challenged speech constituted extremely abusive language.

It is hard to think of an English term that is more abhorrent. *See, e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir. 1998) ("[n****r]" is "the most noxious racial epithet in the contemporary American lexicon"); Randall L. Kennedy, *The David C. Baum Lecture: "Nigger!" As A Problem in the Law*, 2001 U. Ill. L. Rev. 935 (2001) (citing Webster's Dictionary for the proposition that the slur is "probably the most offensive word in English."). This vile epithet has a "unique . . . power to offend, insult, and belittle." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 38 n.3 (2d Cir. 2014)*; see also* Charles R. Lawrence, III, *If He Hollers Let Him Go: Regulating Racist Speech on Campus*, 1990 Duke L.J. 431, 452 (1990).

Indeed, this epithet is so loaded with a legacy of slavery and racial hatred that it is inextricably linked with prejudice and hostility toward African Americans. *See Nigger*, Oxford English Dictionary, https://www.oed.com/viewdictionaryentry/Entry/126934; *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring)

9

(because the slur "'sums up . . . all the bitter years of insult and struggle in America'" "no other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans") (quoting Langston Hughes, The Big Sea 269 (2d ed. 1993) (1940)); Richard Delgado, *Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling*, 17 Harv. C.R.-C.L. L. Rev. 133, 169 (1982) (noting that use of this "slur necessarily calls upon the entire history of slavery and racial discrimination in this country"). For these reasons, we have previously recognized that the epithet is "[f]ar more than a 'mere offensive utterance'" — it is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); *see also Savage v. Maryland*, 896 F.3d 260, 277 (4th Cir. 2018) (quoting *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 23 (1993)). Without any reservation, we reiterate that indictment today.

But the Virginia statute does not (and could not consistent with the First Amendment) criminalize the mere statement of this abhorrent word. The Government recognizes, "even the most egregious racial slur is not a fighting word *per se*. The circumstances in which the word is used matter a great deal." Gov't Br. at 20.

As explained above, Virginia's highest court has authoritatively construed Virginia Code § 18.2-416 to require proof beyond a reasonable doubt that the "abusive language" was "likely to provoke a violent reaction and retaliation . . . by the person to whom, individually, [the language was] addressed." *Mercer*, 199 S.E.2d at 726; *see also id.* (the Virginia statute "addresses itself to a direct confrontation of individuals in which one . . . uses violent abusive language concerning the other"). Supreme Court precedent requires

10

this construction. *Johnson*, 491 U.S. at 409 (the Government must prove the abusive language was a direct personal insult); *Cohen*, 403 U.S. 15 at 20 (same); *Gooding*, 405 U.S. at 528 (the Government must prove that the abusive language was likely to cause "the person addressed [to] make an immediate violent response"). Accordingly, to establish a violation of § 18.2-416, the Government must identify to whom the defendant "individually addressed" the challenged language and prove that the language was likely to provoke an immediate violent reaction by that person or a reasonable person in that individual's position.

The Government maintains that Bartow addressed the slur to both Johnson-Felder and the African American man. The magistrate judge found that Bartow directed the slur at the African American man. The district court did not state to whom it believed the vicious slur was addressed, but it seemed to base its affirmance on the reaction of the white lieutenant colonel to Bartow. The parties agree, however, that he was not Bartow's addressee. For purposes of our discussion, we will assume the slur was directed at Johnson-Felder and the African American man.

We turn to the relevant evidence offered with respect to the violent reaction of Johnson-Felder and/or the African American man. But there is no such evidence. The Government offered no evidence that either of them actually responded violently to Bartow's hateful slur or that a reasonable person in their positions would have done so. The Government offered no testimony of any kind from the African American man, or about his response to the epithet, and Johnson-Felder only testified that before Bartow uttered the epithet his odd questions to her left her "taken aback." No witness testified to,

11

and the video does not reveal any evidence of, the likelihood of a violent response from anyone in reaction to Bartow's epithet, which he used while sitting on the floor trying on shoes.

Everything about Bartow's remarks was offensive and bizarre, and their meaning was difficult to discern.[3] His words were laden with references to various bodily functions, sexual diseases, genitalia, and ultimately, a noxious racial epithet. The video shows that, while Bartow was speaking, people stopped to watch the scene unfold, and some engaged with him. But most of the observers left to carry on with their shopping before security escorted Bartow from the store. And those who stayed continued to try on shoes, as Bartow did. There are no signs of violence. No one reported, and the video does not reveal, that Bartow was likely to, or actually did, invoke a violent response. The Supreme Court has made clear that to obtain a conviction for use of "fighting words," the Government must offer evidence of the "likelihood that the person addressed would make an immediate violent response." *Gooding*, 405 U.S. at 528. Here, it has not.

Although now rare, criminal convictions for the use of "fighting words" still are possible, but they require the prosecution to offer compelling evidence that meets all the limitations on the "fighting words" doctrine. *State v. Liebenguth*, No. 20145, 2020 WL 5094669 (Conn. Aug. 27, 2020), demonstrates this point. There, the prosecution presented

---

[3] Bartow suggests in his briefs that his remarks reflect his discomfort with gender labels and sex stereotypes. Opening Br. at 10–11, Reply Br. at 1–2, 5. He maintains that he used the slur because "just like it can be 'offensive and degrading' to be called '[n****r],' it 'can be degrading, humiliating, invalidating, and mentally devastating' for a transgender person to be misgendered, to be called 'sir' when they are not a male or 'ma'am' when they are not a female." Reply Br. at 8 (citations omitted).

undisputed evidence from both an independent witness and the African American target, a parking enforcement officer, of the words and actions of the white defendant after the officer ticketed him. The defendant, "angrily" and "loudly" asserted that the officer was "fucking unbelievable," *id.* at \*9, stepped toward the officer in an aggressive and threatening manner, *id.* at \*2, and warned the officer to "remember Ferguson [where an African American man had died at the hands of a white man only three weeks before]," *id.* Then, the defendant entered his vehicle, uttered "fucking [n\*\*\*\*rs]" to the officer, twice circled the lot, then pulled up next to the officer and with an angry facial expression repeated, "fucking [n\*\*\*\*rs]," this time more loudly than before. *Id.* at \*2–9. The officer remained calm but understood these words constituted a "threat." *Id.* at \*2. Connecticut's highest court sustained the defendant's conviction, explaining that the defendant's "repeated" use of the ugly epithet, the defendant's use of other threatening and abusive words, the defendant's "menacing invocation" of Ferguson, the defendant's offensive and irate body language, and the officer's recognition of this as a threat established that the defendant had used "fighting words" "likely to provoke a violent reaction." *Id.* at \*8–9.

The Government has offered no similar evidence here. The record contains no evidence that Bartow employed other profanity, repeated the vile slur, or issued any kind of threat, let alone one dripping with racism. While he did point to Johnson-Felder and to the lieutenant colonel (and others) while he was talking, the video does not suggest that Bartow was pugnacious. He did not take any aggressive actions that might have provoked violence. Indeed, Bartow's "mode of speech," *R.A.V.*, 505 U.S. at 386 — a series of rhetorical questions while trying on shoes — did not provoke anyone. Unlike the

13

Connecticut case, here the Government has failed to offer any contextual evidence that Bartow's "mode of speech" was likely to provoke violence by Johnson-Felder or the African American man or anyone else.

In sum, the Government has not proven that Bartow's use of the vile slur was "likely to provoke a violent reaction . . . by the person to whom, individually, [it was] addressed," *Mercer*, 199 S.E.2d at 726; the Government has not proven the slur was used as a "direct personal insult," *Johnson*, 491 U.S. at 409; and the Government has not proven that "the actual circumstances" of Bartow's use of the slur were particularly conducive to violence, *id*. This total lack of evidence requires us to vacate Bartow's conviction.

Our holding necessarily follows from the Supreme Court's stringent evidentiary demands. The Court has so narrowed the "fighting words" exception that it has not upheld a criminal conviction under the doctrine since *Chaplinksy* itself. We cannot do so today. Over the decades, the Court has repeatedly determined that the First Amendment places considerable limits on the criminalization of speech. We must abide those limits, even if that means, as it does here, that shameful speech escapes criminal sanction.

IV.

For the foregoing reasons, we reverse the judgment of the district court and remand the case to that court to vacate Bartow's conviction and sentence.

*REVERSED AND REMANDED*