J-S09008-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHELLY R. HANNER | : | |
| | : | |
| Appellant | : | No. 880 WDA 2022 |

Appeal from the Judgment of Sentence Entered July 5, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002734-2021

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: July 13, 2023**

Appellant, Shelly R. Hanner, appeals from the judgment of sentence of a one-year period of probation and fifty hours of community service entered following her conviction by a jury for one count of harassment, predicated on her calling a ten-year-old boy a "fucking little snitch."  Appellant contends that we should construe the statutory phrase "obscene language" to carry the same meaning that we require for disorderly conduct, which holds that language is obscene only if it is meets the test set forth in **Miller v. California**, 413 U.S. 15 (1973), which, generally speaking, requires a sexual connotation.  We apply this standard as the Commonwealth pursued a theory equating "obscene language" with the **Miller** standard, and the jury was instructed accordingly.  We further conclude that Appellant's remarks were not "threatening" under the circumstances.  We therefore reverse Appellant's judgment of sentence and order Appellant discharged, as Appellant's language was not obscene in

that sense, nor threatening, and the Commonwealth failed to meet its burden to establish the elements of the crime that it charged and pursued.

The facts, as taken in the light most favorable to the Commonwealth as the verdict winner, are straightforward. Sometime during 2021, Appellant's two children were in the foster care system while Appellant was dealing with an incident of domestic abuse in which she was the victim. Her two children stayed with N.M., who is the mother of the victim in this case, S.M. On September 11, 2021, N.M. permitted S.M., who was then ten years old, to ride his bike home from his grandmother's home. Shortly thereafter, S.M. returned to the house, crying and scared.

S.M. testified that he encountered Appellant while bicycling home. He saw a vehicle stopped in the road near a gas station. The driver asked S.M. "do you remember me? I'm [her children's] mom." N.T., 4/18/21, at 32. S.M. recognized the driver as Appellant. Appellant then pulled into the station's parking lot and loudly and aggressively berated S.M., twice calling S.M. a "fucking little snitch." *Id.* S.M. was scared, started crying, and biked back to his grandmother's home.

Appellant was charged with one count of harassment pursuant to 18 Pa.C.S. § 2709(a)(4), which states that a person commits harassment "when, with intent to harass, annoy or alarm another, the person … communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures[.]" Because the Commonwealth's

theory of the case is relevant to our disposition, we quote the parties'

discussion of the jury instructions:

> THE COURT: So we're on the record right now. I'm speaking to both counsel about the standard jury instruction for harassment, and, again, the [c]ourt's original intention would be to simplify it and read the first element that has to be proven is that the defendant communicated to [S.M.] any threatening or obscene words or language, and then [the] second element, proven that the defendant did so with the intent to harass, annoy, or alarm, and then give the definition of intentionally. In the conversation just leading up to going on the record, [Appellant] believes that the definition of what obscene is, which was taken from the standard jury instruction, should be given.
>
> * * *
>
> THE COURT: So you would be asking for the part of the instruction that begins with words or language are obscene if, and then it gives the three different definitions?
>
> [Appellant]: Yes.
>
> THE COURT: And then also gives the – defines contemporary community standards and the term sexual conduct.
>
> [Appellant]: Yes.
>
> THE COURT: [Commonwealth], your thoughts? I mean, this is a standard instruction. I haven't heard from the Commonwealth yet, which is on me, but there's a lot of superfluous language in here. [Commonwealth], your thoughts?
>
> [Commonwealth]: Judge, I will defer to you.

**Id.** at 52-53.

Consistent with this discussion, the trial judge instructed the jurors as

follows:

> THE COURT: To find the defendant guilty of this offense, you must find that each of the following elements have been proven beyond a reasonable doubt.

First, that the defendant communicated to [S.M.] any threatening or obscene words or language. Now, threatening words are self-explanatory. Obscene words or language has a specific definition. **Words or language are obscene if the average person applying contemporary community standards would find that the subject matter taken as a whole appeals to the prurient interest.**

In defining the term obscene[,] I have used a term that itself must be defined: Contemporary community standards. Contemporary community standards refers to the standards of the people of the whole Commonwealth of Pennsylvania at the time of the alleged offense.

*Id.* at 84-85 (emphasis added).

Following her conviction at the jury trial and her subsequent sentencing, Appellant filed a timely notice of appeal and complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal, asserting that her conviction was "based on the use of the phrase 'f-ing snitch' to the victim. Pursuant to well-settled case law, [Appellant] respectfully submits the facts … were insufficient to sustain a conviction for Harassment." Concise Statement, 9/6/22, at unnumbered 1. The trial court issued a Rule 1925(a) opinion, concluding that the evidence was sufficient:

In this case, the evidence established that [Appellant] yelled in a loud and aggressive voice at a 10-year old, and told him twice that he is an [*sic*] "f-ing little snitch" (while using the full profane word). Therefore, the jury was well within its discretion as the finders of fact when it obviously determined that an adult who aggressively yelled profanities at a 10-year-old child was guilty of Harassment. The language used was both threatening and obscene and was done with the intent to harass.

Trial Court Opinion, 9/27/22, at 3.

Appellant raises one issue for our review:

1. Did the Commonwealth present insufficient evidence to sustain Appellant's conviction for harassment, 18 Pa.C.S.[] § 2709(a)(4), where Appellant did not communicate any threatening or obscene words or language?

Appellant's Brief at 7.

We apply the following principles when determining whether the Commonwealth produced sufficient evidence to convict:

A challenge to the sufficiency of the evidence is a question of law requiring a plenary scope of review. The appropriate standard of review regarding the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offenses. As a reviewing court, we may not weigh the evidence and substitute our judgment for that of the fact-finder. Furthermore, a fact-finder is free to believe all, part or none of the evidence presented.

*Commonwealth v. Brooks*, 7 A.3d 852, 860 (Pa. Super. 2010).

Whether the evidence was sufficient to convict turns on what the General Assembly intended by the terms "obscene" and/or "threatening." *See Commonwealth v. Gamby*, 283 A.3d 298, 302–03 (Pa. 2022). This presents a pure question of law involving statutory interpretation, and our scope of review is plenary and our standard of review is *de novo*. *Commonwealth v. Foster*, 214 A.3d 1240, 1247 (Pa. 2019).

The General Assembly has not defined "obscene" or "threatening[,]" and Appellant submits that this is an issue of first impression. She does not offer a traditional, statutory analysis of the terms. Instead, with respect to the definition of "obscene," Appellant directs our attention to caselaw interpreting a subsection of the disorderly conduct statute, which criminalizes the

following: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he … uses obscene language, or makes an obscene gesture[.]" 18 Pa.C.S. § 5503(a)(3). In **Commonwealth v. Bryner**, 652 A.2d 909 (Pa. Super. 1995), we discharged a conviction under that subsection because the language did not rise to the level of "obscenity" as defined by **Miller**, which holds that material is "obscene" only if it, *inter alia*, "appeals to the prurient interest[.]" **Id.** at 912 (quoting **Miller**, 413 U.S. at 24). A "prurient interest" has "a tendency to excite lustful thoughts," **Roth v. United States**, 354 U.S. 476, 487 (1957), which roughly encompasses "a shameful or morbid interest in nudity, sex, or excretion…." **Id.** at 487 n.20. In **Bryner**, it was clear "that the epithet hurled at Mrs. Long[ — "Go to hell, Betsy" —] ... did not, in any way, appeal to anyone's prurient interests." **Id.** Appellant asks us to adopt these same principles with respect to the harassment statute and conclude that her language, while coarse and crude, did not appeal to the prurient interest and, thus, cannot meet the **Miller** standard. As to "threatening," Appellant points out that the criminal information did not reference the "threatening language" component of the statute. In any event, Appellant submits that her language was not threatening in any way.

The Commonwealth does not address Appellant's arguments. Instead, in a cursory two-and-one-half page brief, the Commonwealth recites the standard of review and agrees with the trial court's analysis. Commonwealth's Brief at 2.

Appellant's fundamental claim is that her conviction rests upon her saying "fucking"; *i.e.*, if she had merely called S.M. "a little snitch" there would be no basis to convict. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992). "From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas…." *Id.* at 382-83. *See also Matal v. Tam*, 582 U.S. 218, 248 (2017) ("Those few categories of speech that the government can regulate or punish—for instance, fraud, defamation, or incitement—are well established within our constitutional tradition.") (Kennedy, J., concurring). In this case, the jury instructions touched on three of these: obscenity, "fighting words," or "true threats."

A citizen cannot be punished due to the mere use of a word, no matter how offensive. In *Cohen v. California*, 403 U.S. 15 (1971), Cohen was convicted of "maliciously and willfully disturb(ing) the peace or quiet of any neighborhood or person … by … offensive conduct." *Id.* at 16 *(*quoting statute; all alterations in original). His charge was based solely on wearing a jacket in a courthouse corridor with the phrase "Fuck the Draft" plainly visible to the public, which he wore to protest the Vietnam War. The United States Supreme Court held that the conviction violated the First Amendment.

The *Cohen* Court began by explaining that the conviction rested "upon the asserted offensiveness of the words Cohen used to convey his message to

the public." *Id.* at 18. Thus, the case involved "a conviction resting solely upon 'speech' … not upon any separately identifiable conduct…." *Id.* The case did not involve "those relatively few categories of instances where prior decisions have established the power of government to deal more comprehensively with certain forms of individual expression simply upon a showing that such a form was employed." *Id.* at 19-20. The **Cohen** Court stated, "This is not, for example, an obscenity case. Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Id.* at 20 (citing **Roth**, **supra**).

Because the case did not involve any recognized exception to criminalizing speech, the case reduced to whether the use of the word "fuck" "is inherently likely to cause violent reaction or upon a more general assertion that the States, acting as guardians of public morality, may properly remove this offensive word from the public vocabulary." *Id.* at 22-23. In the Court's judgment, "most situations where the State has a justifiable interest in regulating speech will fall within one or more of the various established exceptions, discussed above but not applicable here, to the usual rule that governmental bodies may not prescribe the form or content of individual expression." *Id.* at 24. **Cohen** therefore forbids attempts to "make the simple public display" of an expletive a criminal offense. *Id.*

We recognize that a harassment conviction is arguably not predicated on the speech itself but rather the conduct accompanying the speech. For

instance, in **Commonwealth v. Hendrickson,** 724 A.2d 315 (Pa. 1999), our Supreme Court rejected an overbreadth challenge to former 18 Pa.C.S. § 5504, which criminalized harassment via telephone. The Court stated, "The statute is not directed at the content of speech and is unrelated to the suppression of free expression. Rather, the statute focuses on the manner and means of communication and proscribes communications made with an intent to harass." **Id.** at 318. However, while we agree with Appellant that there is no decision from our appellate courts squarely addressing whether the harassment statute incorporates the **Miller** test with respect to "obscene language," reported decisions have accepted that a harassment conviction is valid only if the speech falls within a First Amendment exception. Recently, in **Commonwealth v. Collins**, 286 A.3d 767, 771 (Pa. Super. 2022), *reargument denied* (Jan. 19, 2023), we affirmed a harassment conviction under subsection (a)(3), which applies where the actor, with the requisite intent to "harass, annoy or alarm another ... engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose." 18 Pa.C.S. § 2709(a)(3). Collins had produced "wanted posters" and letters depicting Hoffman's face, which "were clearly intended to be insulting, attacking Hoffman's appearance ('it's got a goat face and smells like a pig'), parentage (stating that Hoffman was 'a Billy goat [crossed] with a pig'), and character (stating that Hoffman was 'yellow,' *i.e.*, cowardly)." **Id.** at 776-77 (quoting trial court opinion). Collins argued, *inter alia*, that his speech was protected by the First Amendment on an as-applied basis. We disagreed.

Collins is correct that his speech does not fall within the identified exceptions to the First Amendment set forth in **Chaplinsky** [**v. New Hampshire,** 315 U.S. 568 (1942)]: his posters and letters did not contain obscenities; no proof was offered that Collins' description of Hoffman was untrue, and in any event, Section 2709(a)(3) does not target defamation; and his speech did not technically constitute "fighting words" as Hoffman was not present when Collins distributed the posters or letters were distributed and therefore it was unlikely that they would have led to "an immediate breach of the peace." **Chaplinsky**, 315 U.S. at 572…. However, the **Chaplinsky** exceptions do not purport to be an exhaustive list of the categories of speech that may be prosecuted under the First Amendment. Indeed, additional categories of offenses that criminalize speech—including solicitation, extortion, and other speech "integral to criminal conduct"—have been deemed to pass constitutional muster.

. . . .

Although Collins testified that he was publicizing Hoffman's criminal record in order to advise the public that Hoffman was driving with a suspended license, his purpose was not evident on the face of the poster or letter and Collins admitted that his real motivation was to "get back at [Hoffman] for spreading lies about [him] and flaunting [*sic*] the law." N.T., 9/9/21, at 13, 16-19, 22. There is no question that Collins' publication of Hoffman's criminal record and the insults directed towards him were part and parcel of the two men's long-running feud.

Also crucial in our determination that Collins was engaged in unprotected speech is the fact that he identified Hoffman's home address and the make, year, color, and license plate number of Hoffman's vehicle. The inclusion of this information in the posters and letters served no other apparent purpose than as an invitation for the public to confront Hoffman at his residence or during his travels in the community. **See Frisby v. Schultz**, 487 U.S. 474, 486 … (1988) (upholding ban on residential picketing where picketing did not "seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way"). The belligerent nature of the communication was only accentuated by the juxtaposition of Hoffman's mug shot photograph with Old West-style "wanted poster" language, with an offer of a "$500.00 reward to capture"

Hoffman and "put [him] in a cage." Trial Court Opinion, 1/5/22, at 2. Moreover, Collins did not simply resort to announcing his criticisms of Hoffman to passersby in a public forum, but he also directed his injurious message to various unwilling and unsuspecting recipients through the United States Postal Service, at least one of whom submitted a complaint to law enforcement. In sum, we conclude that Collins' actions here fall outside the ambit of the protection of the First Amendment.

*Id.* at 776–77

As Judge Kunselman argued in dissent, the **Collins** Majority appeared to create a new First Amendment exception:

My learned colleagues in the Majority do not identify any recognized exception to the First Amendment that would apply to Mr. Collins' speech. This deficiency should end our analysis, and Mr. Collins' conviction should be overturned. Nevertheless, the Majority denies his speech constitutional protection by crafting a new exception to the First Amendment, the 'shame and provoke' exception.

*Id.* at 780-81 (Kunselman, J., dissenting) (footnote omitted).

In this case, the Commonwealth deferred to the trial court's decision to instruct the jury that any conviction must satisfy the **Miller** standard, *i.e.*, a recognized exception to the First Amendment's prohibition against criminalizing speech. The Commonwealth did not, and does not now, suggest that Appellant's speech satisfied any other recognized speech exception. Thus, while **Collins** is not directly on point, in that it did not explicitly decide what the General Assembly intended by using the phrase "obscene language," the decision suggests that some type of exception must apply. And, here, the Commonwealth lodged no objection, and in fact deferred to the trial court's instruction that Appellant's language must "appeal[] to the prurient interest."

N.T., 4/18/21, at 84.  Therefore, given the Commonwealth's acquiescence on this point, we will assume for the limited purposes of this appeal that "obscene language" must appeal to the prurient interest in accordance with *Miller*.

There is no doubt that uttering the phrase "fucking little snitch" does not appeal to a prurient interest in sex as the comment has nothing to do with sex.  This is obvious on its face, and readily demonstrated by the disorderly conduct precedents discharging "obscene language" convictions for failing to meet the *Miller* standard.  *See Commonwealth v. Pennix*, 176 A.3d 340 (Pa. Super. 2017) (discharging conviction where the appellant, while detained at courthouse metal detector, shouted "Fuck you police" and similar variants); *Commonwealth v. McCoy*, 69 A.3d 658 (Pa. Super. 2013) (discharging conviction where McCoy repeatedly shouted, "Fuck the police," while observing a funeral procession honoring an officer killed in the line of duty); *Commonwealth v. Kelly*, 758 A.2d 1284 (Pa. Super. 2000) (discharging conviction where appellant said, "Fuck you, asshole," and displayed middle finger to borough employee).  *See also Commonwealth v. Hock*, 728 A.2d 943 (Pa. 1999) (holding that police officer did not have probable cause to arrest for disorderly conduct under separate subsection concerning "fighting or threatening … behavior" where Hock, during encounter with police, stated, "Fuck you, asshole," to officer).  The Commonwealth therefore failed to satisfy

one of the elements of harassment as it understood the elements of the crime.[1]

Next, we acknowledge that the jury was instructed that Appellant was guilty if her words were "threatening," which is likewise criminalized by subsection (a)(4) of the harassment statute. The trial judge informed the jury that the definition of "threatening" was self-evident. We respectfully disagree with the trial court's characterization. Again, accepting for purposes of our disposition that, as in *Collins*, an exception to the First Amendment must apply, the only plausible bases are "fighting words" or "true threats."

Concerning the former, the Commonwealth failed to establish sufficient evidence that Appellant used "fighting words." The basic formulation of that doctrine was stated in *Cohen*. "[T]he States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen*, 403 U.S. at 20.

Whether language qualifies as "fighting words" requires consideration of the facts. In *Commonwealth v. Mastrangelo*, 414 A.2d 54 (Pa. 1980), our

---

[1] While Appellant does not discuss due process issues, it would be unusual to determine whether the Commonwealth produced sufficient evidence to meet a "lesser" form of "obscene language" when the Commonwealth failed to ask for an instruction that deviated from the *Miller* test. The Commonwealth proceeded as if Appellant's language met the *Miller* obscenity standard, and nothing prevented the Commonwealth from submitting an alternative instruction.

Supreme Court upheld a conviction for disorderly conduct based on this exception where the appellant, who saw a borough employee issue a parking ticket for his car, repeatedly called her a "fucking pig." *Id.* at 55. The next day, the appellant saw the employee on patrol and followed her, "shouting at her and calling her, among other things, a 'n***** lover' and a 'cocksucker.'" *Id.* at 56 (expurgation added). The Court rejected the appellant's as-applied challenge, concluding that his speech qualified as "fighting words." "It is clear in the instant case that [the] appellant was not exercising any constitutionally protected right; rather, in a loud, boisterous and disorderly fashion, he hurled epithets at the meter maid which we believe fit the *Chaplinsky* definition of fighting words." *Id.* at 58. In *Hock*, *supra*, where the appellant shouted, "Fuck you, asshole," to a police officer, the Court distinguished *Mastrangelo,* stating that "in determining whether words constitute fighting words, the circumstances surrounding the words can be crucial, for only against the background of surrounding events can a judgment be made whether the words had a direct tendency to cause acts of violence by others." *Hock*, 728 A.2d at 946 (cleaned up). Appellant's insults do not remotely compare to the racial epithet in *Mastrangelo*, and under the factual circumstances, a rational fact-finder could not conclude that Appellant intended to goad S.M. into a violent encounter.[2] Appellant's language was abusive and uncouth, especially

_____

[2] *Mastrangelo*, decided over forty years ago, is arguably inconsistent with later United States Supreme Court caselaw. The case quoted a lengthy
*(Footnote Continued Next Page)*

- 14 -

when directed at a ten-year-old child, but her words were not likely to provoke a violent reaction.

We now address whether the speech qualified as a "true threat." "Speech which communicates a serious expression of intent to commit an act of unlawful violence against a particular individual or group of individuals — more commonly referred to as a 'true threat' — is another certain class of speech that … is beyond the protective ambit of the First Amendment." *Interest of J.J.M.*, 265 A.3d 246, 254 (Pa. 2021) (internal quotation marks and citation omitted). The hallmark of a "true threat" is that it "threatens unlawful violence." *See Commonwealth v. Knox*, 190 A.3d 1146, 1155 (Pa. 2018). Appellant's statements were insulting but nothing in her diatribe, either as an individual statement or in the aggregate, threatened harm to S.M.[3] We

_____

passage from *Chaplinsky* stating, *inter alia*, that words qualify as "fighting words" if "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Mastrangelo*, 414 A.2d at 58 (quoting *Chaplinsky*, 315 U.S. at 572). However, it is not clear on what specific basis the *Mastrangelo* Court determined that the speech qualified as "fighting words." As the United States Court of Appeals for the Fifth Circuit recently remarked, "in the decades since *Chaplinsky*, the Court has imposed a number of limitations on the 'fighting words' exception to First Amendment protection." *United States v. Bartow*, 997 F.3d 203, 207 (4th Cir. 2021). *See id.* at 207-10 (summarizing development of United States Supreme Court caselaw and concluding that calling an African-American man the n-word did not qualify as "fighting words" under the circumstances).

[3] We also note that the "true threat" doctrine poses difficult questions with respect to intent. *See generally Knox*, *supra*; *see also Counterman v. Colorado*, 143 S.Ct. 644 (2023) (granting petition for writ of *certiorari* to decide whether the speaker must subjectively know or intend the threatening nature of a statement, or whether it is sufficient to establish that an objective
*(Footnote Continued Next Page)*

therefore conclude that a rational fact-finder could not conclude, even when granting all reasonable inferences to the Commonwealth as the verdict winner, that Appellant issued a "true threat." We therefore reverse Appellant's judgment of sentence and order her discharged.

Judgment of sentence reversed. Appellant discharged.

Judge Bowes and Judge Sullivan both concur in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/13/2023

---

reasonable person would regard the statement as a threat). In this regard, we note that the trial court mistakenly failed to instruct the jury that Appellant's comments had to be made with the requisite "intent to harass, annoy or alarm another." 18 Pa.C.S § 2709(a). While Appellant did not object to that omission, the fact that the jury was permitted to return a verdict based solely on the words that Appellant used poses serious difficulties in our ability to affirm the conviction on an alternative basis.